427 So.2d 1341 (1983)
Janice Murphy HART, Plaintiff-Appellant & Defendant-in-Reconvention,
v.
Lloyd D. HART, Defendant-Appellant & Plaintiff-in-Reconvention.
No. 15212-CA.
Court of Appeal of Louisiana, Second Circuit.
February 22, 1983.
Writ Denied April 15, 1983.
Blackwell, Chambliss, Hobbs & Henry by Sam O. Henry, III, West Monroe, for plaintiff-appellant & defendant-in-reconvention.
*1342 Michael S. Ingram, Monroe, for defendant-appellant & plaintiff-in-reconvention.
Before JASPER E. JONES, SEXTON and NORRIS, JJ.
SEXTON, Judge.
Lloyd D. Hart appeals a trial court judgment decreeing Janice Murphy Hart to be his good faith putative spouse. He also contests the decree of the trial court which awarded the custody of Daniel Wade Hart, a five year old child born of the Hart union, to Mrs. Hart. We affirm.
The events involved in this case span almost two decades. In 1963 Mrs. Hart, then Janice Murphy, married James W. Lowery. Elizabeth Christian "Chris" Lowery was born of the marriage in 1964. The two spouses ceased living together in about February of 1967. Sometime after August 9, 1967, Mrs. Hart, (then Mrs. Lowery) went to El Dorado, Arkansas, for the sole purpose of obtaining a divorce. On September 29, 1967, her Arkansas attorney filed a petition for divorce. On November 1, 1967, the Chancery Court of Union County, Arkansas, granted the divorce. Neither Mrs. Hart nor her witness appeared before the court and the case was decided on affidavits.
In 1967, Mrs. Hart met Mr. Hart. The two were married on January 3, 1974, in Marshall, Texas. After a brief time they began living together in Ouachita Parish at the Magnolia Motel which is owned by Mr. Hart. Daniel Hart, the subject of the custody action, was born on July 18, 1977. Mr. Hart subsequently bought a home on Love Road into which Mrs. Hart moved in November of 1978 after extensive renovations were completed. Mr. Hart remained at the motel. It appears that the already deteriorating marriage had essentially collapsed at about this time.
On August 12, 1981, Mrs. Hart filed a petition for separation from Mr. Hart on grounds of cruel treatment. In addition, she requested custody of Daniel and alimony and child support. Mr. Hart filed a reconventional demand contending that the marriage was a nullity because of infirmities in the Arkansas divorce Mrs. Hart obtained from her first husband. Mr. Hart alleged that Mrs. Hart contracted the marriage with him in bad faith and was therefore not entitled to receive any civil effects from the marriage between them. He also sought custody of the child.
The custody issue was originally litigated by rule in late August of 1981. Mr. Hart apparently had physical control of the child at that time, but by judgment dated September 10, 1981, the trial court transferred custody of Daniel from Mr. Hart, then age 64, to Mrs. Hart, then age 39, in "the best interests of the child."
In written reasons for this judgment the trial court made a number of significant observations. The court noted that Mr. Hart had not seen or talked to a daughter of his from a previous marriage for a period of 30 years. The court observed that Mrs. Hart had conceived a child out of wedlock approximately 18 years ago, and that Mrs. Hart had given up the child for adoption.
The court further observed that Mr. Hart continued to live at the motel subsequent to the purchase of the home on Love Road, although he did occasionally visit the Love Road residence. Mrs. Hart worked at the motel during the day, and returned to the Love Road residence at night. The child, similarly, stayed at the motel during the day, and returned home with his mother at night.
There was a dispute as to when Mr. Hart gained physical control of the child. Mr. Hart asserted that he obtained physical control of the child in April of 1980. Mrs. Hart adamantly contended that Mr. Hart's control did not occur until February of 1981 when she became ill. Notwithstanding this factual dispute, the trial court stated that while in the physical custody of the father the child ate all his meals in various restaurants and had no association with other children. His only associates were his father's friends. Although the child was nearing school age, the father was evasive and non-committal about school plans for the child. The father was found to be possessive and unwilling to allow the child to spend time with his mother.
*1343 The trial from which this appeal was taken began April 2, 1982, and the cause was concluded by written reasons filed April 22 and a judgment signed April 30, 1982. The major issues at the trial, aside from the validity of the Arkansas divorce, concerned the contention that Mr. Hart harassed his wife, the allegation that Mrs. Hart was a poor housekeeper, and the charge that Mrs. Hart and her daughter Chris had beaten the child. Mr. Hart introduced photographs he took of the Love Road home on January 10, 1982, in order to support the factual allegation of poor housekeeping. Mr. Hart also introduced photographs taken of the child showing a minor injury to the eye.
Mrs. Hart contended that the photographs depicting an unkempt premises were staged and asserted that Daniel had injured his eye by tripping and falling. Chris Lowery supported her mother's assertions in this regard. Mrs. Hart further asserted that the motel owned by Mr. Hart and at which he lives was used for immoral purposes.
The trial was characterized by the presentation of directly conflicting testimony on several issues. It is apparent, however, that the marriage was marred by violent arguments between the spouses.
At the conclusion of the trial, the court held that the Arkansas court had no jurisdiction to divorce Mrs. Hart from her first husband.[1] The trial court declared that Mrs. Hart had never been legally divorced from her first husband, and that her marriage to Mr. Hart was therefore a nullity. The court noted that the invalid divorce decree which allegedly dissolved Mrs. Hart's first marriage was granted in 1967, and that Mrs. Hart did not marry Mr. Hart until 1974. The trial court obviously inferred from these facts that Mrs. Hart had not gone to Arkansas for the purpose of obtaining a speedy divorce and facilitating a subsequent marriage. The court noted that Mrs. Hart was unable to testify as to exactly when she went to Arkansas, when she left, or whether she had obtained a copy of the judgment. However, the court felt that she was relying on her attorney there to handle the proceedings properly and therefore was in good faith in contracting the marriage with Mr. Hart. The court thus held her to be a putative spouse entitled to receive the civil effects of her marriage to Mr. Hart and awarded Mrs. Hart alimony.
In awarding custody of the child Daniel to Mrs. Hart, the court noted the high level of animosity between the parties and pointed out that each spouse was using the child to hurt the other. The court took note of the photographs showing the residence in an unkempt situation and noted Mrs. Hart's contention that Mr. Hart had deliberately caused the condition depicted. The court did not specifically resolve this conflict, but implicit in the court's ruling is an acceptance of Mrs. Hart's position in this regard.
The trial court concluded by finding that, while Mrs. Hart's situation was not ideal, she should still retain custody  thus strongly implying that her environment was superior to the situation at Mr. Hart's motel.
Mr. Hart now appeals asserting that the trial court erred in finding that Mrs. Hart married him in good faith, and also erred in awarding custody of the child to Mrs. Hart. These assignments form the two issues for our consideration in this appeal.
As to the first issue concerning putative effects, we note that the trial court's ruling that the marriage is a nullity is not before us as Mrs. Hart has not appealed or answered the appeal. We therefore assume the correctness of that ruling and proceed directly to the question of the correctness of the trial court's determination that Mrs. Hart contracted her marriage to Mr. Hart in good faith and is thus entitled to the *1344 effects thereof as per LSA-C.C. Arts. 117 and 118.[2]
The basic principles with respect to good faith under these circumstances were succinctly noted by Judge Price in Galbraith v. Galbraith, 396 So.2d 1364, at 1368, (La.App.2d Cir.1981):
"Good faith in the context of this putative marriage doctrine is defined as an honest and reasonable belief that the marriage was valid and that no legal impediment to it existed. See Funderburk v. Funderburk, 214 La. 717, 38 So.2d 502 (1949). The question of whether a party is in good faith in entering into an invalid bigamous marriage is a subjective inquiry, Succession of Marinoni, 183 La. 776, 164 So. 797 (1935), and depends on all the circumstances presented in any given case. Succession of Chavis, 211 La. 313, 29 So.2d 860 (1947)."
Thus the good faith analysis called for in this context  although incorporating objective elements of reasonableness  is essentially a subjective one. Furthermore, good faith is a factual question and this is another of those circumstances where the finding of the trial court is entitled to great weight. Gathright v. Smith, 368 So.2d 679 (La.1978): Galbraith, supra.
The trial court here was obviously influenced by the seven year delay between the Arkansas divorce and this marriage to Mr. Hart. There is nothing in the record to indicate that Mrs. Hart had an ulterior motive in attempting to procure the Arkansas divorce. The trial court specifically found that Mrs. Hart, as a lay person, was reasonable in relying on her attorney to effect her divorce. Succinctly stated, the facts of this case present a wife who went to Arkansas, and in accordance with Arkansas law, obtained a divorce by summary proceeding. There is nothing in the record to indicate any knowledge on her part of the infirmity in that divorce. She did not avail herself of the expeditious nature of the Arkansas procedure in order to remarry. Under these circumstances we believe the trial court had ample reason to find that Mrs. Hart possessed "an honest and reasonable belief that the marriage was valid and that no impediment to it existed." Galbraith, supra, at 1368. We agree that Mrs. Hart had no actual knowledge of the infirmity of her previous divorce and that Mrs. Hart was therefore in good faith in marrying Mr. Hart. We wish to make it clear, however, that reliance on one's attorney does not always constitute good faith in circumstances such as these. We merely hold that under the cumulative mix of facts present in this case  including the seven year lapse between the invalid divorce decree and Mrs. Hart's remarriage  the trial court was not clearly wrong in finding that Mrs. Hart contracted her second marriage in good faith.
With respect to the custody of the child Daniel, it has been too often stated to require citation that the trial court's determination in this regard is also entitled to great weight. It is not to be disturbed absent a showing of an abuse of discretion. Most of the evidence of the circumstances pertinent to custody was apparently taken on the original rule. That ruling was not appealed, and as we previously noted, the issues relative to custody at this trial revolved mainly around Mrs. Hart's housekeeping and whether she had abused the child. The testimony was in conflict in this regard and implicit in the trial judge's determination is his acceptance of Mrs. Hart's version of these circumstances. The trial court was obviously influenced by the disparity in ages. The court furthermore preferred Mrs. Hart's residential environment to the motel environment provided by Mr. *1345 Hart. We find no abuse of discretion in these determinations.
For the reasons assigned the judgment appealed from is affirmed at appellant's cost.
AFFIRMED.
NOTES
[1] Our learned brother at the trial level held, correctly we think, that the divorce decree was invalid. The Arkansas court did not have the requisite jurisdiction to render a divorce. Mrs. Hart was never domiciled in Arkansas, nor did she meet the Arkansas residency requirements.

Thus, the Arkansas court never had jurisdiction over her status. Williams v. North Carolina, 325 U.S. 226, 65 S.Ct. 1092, 89 L.Ed. 1577; Hampson v. Hampson, 271 So.2d 898 (La. App.2d Cir.1972); Andries v. Andries, 398 So.2d 123 (La.App.3d Cir.1981).
[2] Art. 117. Civil effects of putative marriage

The marriage, which has been declared null, produces nevertheless its civil effects as it relates to the parties and their children, if it has been contracted in good faith.
Art. 118. Persons entitled to civil effects of putative marriage
If only one of the parties acted in good faith, the marriage produces its civil effects only in his or her favor, and in favor of the children born of the marriage.